**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| RAUL SOLIS, III, et al.,          ) | |
|                            ) | |
|         Plaintiffs,       ) | Civ. Action No. |
|                            ) | 5:19-cv-01194-FB-ESC |
| v.                         ) | |

RAUL SOLIS, III, et al.,

    Plaintiffs,

v.

CRESCENT DRILLING AND
PRODUCTION, INC. and CRESCENT
DRILLING FOREMAN, INC.,

    Defendants.

Civ. Action No.
5:19-cv-01194-FB-ESC

**DEFENDANTS CRESCENT DRILLING AND PRODUCTION, INC. AND CRESCENT DRILLING FOREMAN, INC.'S MOTION FOR DECERTIFICATION**

DATED: March 2, 2022

Respectfully Submitted,

SEYFARTH SHAW LLP

**By: /s/ Annette A. Idalski**
    Annette A. Idalski
    Bar No. 00793235
    aidalski@seyfarth.com

    Brian A. Smith
    *Admitted pro hac vice*
    bsmith@seyfarth.com

SEYFARTH SHAW LLP
1075 Peachtree St, Ne.
Suite 2500
Atlanta, GA 30309-3958
Telephone:    404-885-1500
Fax            404-892-7056

*Attorneys for Defendants*

Plaintiff Raul Solis ("Solis") and each of the 11 opt-ins left in this case (18 have withdrawn) present drastically different circumstances making this case highly inappropriate for collective treatment. Significantly, Solis and the opt-in plaintiffs did not even perform the same services or jobs, and some did not even perform services for the same operator. These facts alone require decertification. But, there is plenty more evidence supporting decertification that has piled up against Solis and the opt-ins. While Crescent Drilling and Production, Inc. and Crescent Drilling Foreman, Inc. (collectively, "Crescent") had to fight for over two years to finally obtain tax returns for Solis and many of the opt-ins, these tax returns and Plaintiffs' own testimony underscore that each made entirely different decisions in the operation of their independent consulting businesses with respect to: the projects they elected to accept, the fee they negotiated for their services; and the expenses they chose to incur and write off in order to realize a profit or a loss. This is exactly the reason that the majority of federal courts, including the Fifth Circuit, are loath to certify collective actions consisting of independent contractors. The fact-specific economic realities test is simply not appropriate for collective treatment for independent contractors. This case must be decertified in order to avoid what will inevitably amount to a series of unmanageable mini-trials with no efficiencies to be gained, and Crescent's ability to defend against each plaintiff's claims compromised.

## PROCEDURAL HISTORY

On October 4, 2019, Plaintiffs' claims in this FLSA collective action were severed from a previously filed action against Crescent following the unexpected death of the original plaintiff, Kevin Langen. (ECF No. 4.) An Amended Complaint was filed on October 18, 2019 (ECF No. 5), which Crescent answered on November 11, 2019. (ECF No. 6.) On April 21, 2020, the Court entered an order granting conditional certification for a collective described as: "oilfield workers who provided services to or on behalf of [Crescent] and were staffed to Sanchez Oil & Gas Corporation ("Sanchez") or Pioneer Natural Resources Company ("Pioneer") during the past three

years who were classified as independent contractors and paid on a day-rate basis with no overtime." (ECF No. 43, at 3). The collective was limited to workers who were staffed to Sanchez and Pioneer based upon the work of the two named plaintiffs at the time; Plaintiff Raul Solis, III who was staffed with Sanchez, and Plaintiff Fritz John Hoeflein, III who was staffed with Pioneer. *(Id).*  The opt-in period for potential collective members closed on October 12, 2020, during which time 29 individuals opted into this litigation.  (ECF No. 91).

Following the close of the opt-in period, on December 4, 2020, Plaintiff Hoeflein withdrew from the litigation. (Doc. No. 119).  Subsequently, opt-in David McDaniel was substituted as a named plaintiff via a Second Amended Complaint filed on January 14, 2021.  (Doc. No. 142).[1] On March 9, 2021, McDaniel also withdrew from this litigation, leaving Solis as the sole named plaintiff representing **only** the interests of the Sanchez opt-ins.  (Doc. No. 161). **There is currently no named Plaintiff representing the Pioneer opt-ins**.  As of the date of this filing, 11 opt-ins and named Plaintiff Raul Solis remain in this case.  Of the 29 individuals who filed consent forms and opted in, **18 individuals have withdrawn**. (Doc. No.'s 94, 123, 149, 161, 181, 200, 218).

## I.    CRESCENT'S BUSINESS

Crescent contracts with independent consultants, such as Solis and the opt-in plaintiffs, to process their invoices for the services performed by the consultants for Crescent's customers, who are primarily oil and gas operators.  (Dec. of L. Ligori, Doc. No. 19-1 at ¶ 4).  Crescent acts as an invoicing company.  (Ex. 1, Dec. of S. McDonald at ¶¶ 5-8)  Some consultants already have a relationship with the oil and gas operators and "bring the work" to Crescent, and in other cases Crescent acts as the middle man, connecting independent consultants with different oil and gas

---

[1]    While not required under the Federal Rules of Civil Procedure, Crescent answered this Complaint out of an abundance of caution on August 23, 2021 (Doc. No. 192).  *E.g., Aircraft Holding Sols., LLC v. Learjet, Inc.,* No. 3:18-CV-0823-D, 2020 WL 6262183, at *3 (N.D. Tex. Oct. 23, 2020) (collecting cases).

operators on a project-to-project, as needed basis.  (*Id.* at ¶ 7).  Independent consultants chose to sign up with Crescent because their invoices are paid faster and they do not have to deal directly with the Operator's requirements.  (*Id.* at ¶ 8).  Operators prefer to use invoicing companies for independent consultants so they can more efficiently process the invoices in bulk to one payee rather than numerous individuals.  (*Id.* at ¶ 9).  In essence, independent oilfield consultants (such as Solis and the opt-in plaintiffs) who are performing work for operators, sell their invoices at a discount to Crescent, who then bills the operator the full amount for the services performed by the consultant. (*Id.* at ¶ 10).  The discount at which a consultant sells his invoice to Crescent is called the "split."  (*Id.* at ¶ 10).  Consultants, such as Solis, pay the "split" to Crescent in exchange for Crescent's administrative services in processing invoices to the operators.  (*Id.* at ¶ 10).

Because Crescent is merely an "invoicing company", and no one employed by Crescent knows how to perform the services Solis and the opt-ins provide, it is no surprise that Solis and the opt-in plaintiffs were not supervised by any Crescent employee while they performed services on location for the operator.  (*Id.* at ¶¶ 4, 11).  They did not contact Crescent about how to perform their job or their schedule.  (*Id.* at ¶ 17).  Solis and the opt-in plaintiffs did not receive any training by any Crescent employee.  (*Id.* at ¶ 12).  Crescent did not provide any equipment or materials to Solis or the opt-ins at any time. (*Id.* at ¶¶ 13, 15). Solis and the opt-in plaintiffs did not receive health insurance or employee benefits from Crescent. (*Id.* at ¶ 14).  While performing their consulting work, Solis and the opt-in plaintiffs did not wear a Crescent uniform. (*Id.* at ¶ 15). Solis and the opt-in plaintiffs did not receive schedules or otherwise have their hours dictated by Crescent and, once at a job site, they did not communicate with any Crescent employee. (*Id.* at ¶¶ 16-17).  Crescent's only role with respect to the day-to-day activities of the independent contractors was that of a payroll provider processing invoices.  (*Id.* at ¶¶ 1-17).

## II.    NAMED PLAINTIFF RAUL SOLIS

4

Named plaintiff Raul Solis was a Production Lead who owned a company called Black Bull Oil and Gas, a limited liability company. (Ex. 2, Black Bull LLC Corporate Records at HOEFLEIN[Solis] 000149). Black Bull Oil and Gas contracted with Crescent for invoicing services for work he performed for Sanchez from November 2016 to December 2016. (Ex. 3, Dep. Of R. Solis at 112:16-21). Solis had a business relationship with Sanchez prior to his relationship with Crescent and began providing services to Sanchez as early as August 2015. (Ex. 4, R. Solis Resume; Ex. 3 at 37:19-38:9, 42:12-44:13, 49:22-50:14). Sanchez employee Jeremy Nursement offered Solis work for Sanchez in August 2015 as a contractor. (Ex. 3 at 43:18-23). In September 2016, Solis began running his invoices through Crescent. (Ex. 3 at 50:15-51:1, 65:21-23). Solis executed an independent contractor agreement with Crescent on September 20, 2016, and then, following the incorporation of Black Bull Oil and Gas LLC, he executed a second independent contractor agreement on November 7, 2016. (Ex. 5, R. Solis Independent Contractor Agreement and Black Bull LLC Independent Contractor Agreement). Ultimately, Solis was released from Sanchez projects by Jeremy Nursement, with no involvement by Crescent, in December 2016. (Ex. 3 at 103:11-16).

## III. NAMED PLAINTIFF SOLIS PERFORMED A DIFFERENT JOB THAN THE OPT-INS.
### A. Solis's Job Role

Solis purports to include "all oilfield workers" in his collective, but their positions are entirely different than Solis' which is fatal to Solis' ability to show he is similarly situated to the collective.

Unlike any of the opt-ins, Solis was a Production Lead for Sanchez and was responsible for supervising about six individuals, including mechanics, well gaugers, and a well tech. (Ex. 3 at 142:22-143:24). His primary consulting role for Sanchez was to monitor and maintain well equipment and ensure that all production facilities were operating properly and at maximum levels for roughly 71 wells. (Ex. 3 at 168:10-169:18; Ex. 6, Sanchez Driving Instructions at HOEFLEIN[Solis, R.] 105). To do this, he would analyze production data collected by his

subordinates, identify any problems or potential problems in well production, diagnose what was causing the problem, and either instruct his subordinates to fix the problem or escalate the problem to Jeremy Nursement, Sanchez Superintendent.  (Ex. 3 at 170:1-172:15, 220:4-221:24).  Solis reported to Kevin Langen, another independent oilfield consultant, or Sanchez well site manager/superintendent Jeremy Nursement.  (Ex. 3 at 111:2-5, 122:19-123:11).  Ultimately, Solis spent the majority of his day in his truck driving as part of his duties.  (Ex. 3 at 216:1-8).

Solis himself admitted that he did not perform any of the roles held by the opt-ins, including: Swab Supervisor, Maintenance Foreman, Flowback Consultant, MWD Field Specialist, Automation Technician, or Company Man—all of which are performed by the opt-in plaintiffs in this litigation.  (Ex. 3 at 123:12-17, 124:1-126:8).  And, unlike Opt-ins Moser and Crutcher, Solis performed no work for Pioneer while utilizing Crescent as his invoicing company.  (*Id.*).

B.     **The Opt-Ins' Job Roles**

1.     Well Site Managers - Crutcher, Richard, Woodson, Alvarez[2]

The Wellsite Manager role is completely different than Solis's role as a Production Lead. Unlike Solis, the WSM is the primary representative of the operator on site and oversees all operations at an individual wellsite, including the work of all other individuals who are at the particular wellsite. (Ex. 12, Dep. of F. Richard at 53:5-13, 56:9-24).  Unlike Solis, the WSM supervises and oversees anywhere from 40 to 100 individuals at any given time.  (Ex. 12 at 56:25-57:15).  Unlike Solis, who did not work in an office, the WSM is an office job, and he primarily works out of an office trailer with a computer.  (Ex. 12 at 53:10-19).  Unlike Solis, the WSM plans and builds procedures for his particular wellsite and tailors these procedures to the specific facts and circumstances as they exist on the ground

---

[2] (Ex. 7, F. Richard 2/3/17 Rate Sheet; Ex. 8, H. Crutcher Independent Contractor Agreement and Rate Sheet, CDF6790-92; Ex. 9, H. Crutcher Invoice, Solis[Crutcher, H] 00917; Ex. 10, T. Woodson 2/2/17 Rate Sheet and Independent Contractor Agreement, CDF631-634; Ex. 11, S. Alvarez 2/22/17 Rate Sheet and Independent Contractor Agreement, CDF642-644).

and maintains and negotiates pricing.  (Ex. 12 at 52:13-17, 54:3-5, 55:22-56:8).  The WSM does not need tools to perform his duties, in contrast to Solis. (Ex. 12 at 53:10-19).  The compensation of a WSM reflects their status as the "head honcho" at the well site, with each earning rates in excess of $1,200 per day as compared to Solis whose rate as $600 to $650 per day.[3]

Further significant is that Crutcher only worked on Pioneer projects and Solis never worked on a Pioneer project. (Ex. 8 at CDF6792; Ex. 9).  Richard, Woodson and Alvarez worked on Sanchez projects but reported to different Sanchez representatives than Solis - Superintendents Bill Mortarello, Jimmy Strubhard, Tom Henson, Robert Chavara, Dale Blocker, Dan Machachu, Joey Bateman, and Lee Chandler.  (Ex. 12 at 54:6-55:17).

2.      Maintenance Foreman - Bustamante[4]

The Maintenance Foreman is responsible for performing maintenance on all oilfield equipment. (Ex. 13, Dep. of J. Bustamante at 30:7-18).  As the Maintenance Foreman, Bustamante utilized thousands of dollars in equipment to perform his job including crescent wrenches, ratchets, and gauge lines, (Ex. 13 at 103:10-16, 107:8-14).  The work is highly technical from a machinery perspective and involves valve work, identifying connections on oilfield equipment and making the connections, and figuring out problems and troubleshooting the equipment.  (Ex. 13 at 30:4-18, 31:2-10, 31:22-32:14, 33:1-11, 38:20-39:9).    Thus, unlike Solis, Bustamante's role was mechanical in nature.  (*Id.*).  Fifteen to 30 individuals reported to the Maintenance Foreman on Sanchez projects.  (Ex. 13 at 39:12-25).

3.      Automation Technician - Johnson and Benn[5]

---

[3]      (Ex. 7; Ex. 8 at CDF6792; Ex. 9; Ex. 10 at CDF631; Ex. 11 at CDF644).
[4]      (Ex. 14, J. Bustamante Independent Contractor Agreement and Rate Sheets).
[5]      (Ex. 15, Dep. of B. Johnson at 84:5-21; Ex. 16, B. Johnson Independent Contractor Agreement and Rate Sheets, Dep. of B. Johnson Ex.'s 3-4; Ex. 17, R. Benn Independent Contractor Agreement and 1/17/18 Rate Sheet, CDF504, 508-10).

Unlike Solis' Production Lead role, the Automation Technician position is a highly technical, **computer-oriented** job, programming analog inputs and outputs, programming functional sequence tables, and ensuring proper hookups on the remote operations controller so that data is captured and stored correctly. (Ex. 15 at 47:25-48:5, 48:14-49:3). Unlike Solis, the Automation Technician also inspects, operates, troubleshoots, repairs, and calibrates the various sensors that measure the output of oil and liquids at a particular well. (Ex. 15 at 88:4:16). The Automation Technician operates out of his truck until a problem is identified at which point, he will exit his vehicle to either troubleshoot, repair, or program until the issue is solved. (Ex. 15 at 89:8-90:24). Unlike Solis, the Automation Technician is responsible for in excess of 1,400 wells and is a lone ranger with no supervisory responsibilities or subordinates. (Ex. 15 at 85:16-19, 97:14-18).

   4.    Safety Consultant - Bienvenu and Ledoux[6]

Unlike Solis, the Safety Consultant was responsible for monitoring on-site working conditions and all safety aspects during frac, coil tubing, wireline, snubbing, flowback and work-over rig operations, ensuring all personnel and equipment operated within regulatory guidelines, developing plans of action with respect to safety and health, and ensuring compliance with health and safety policies and legal requirements. (Ex. 20, Dep. of B. Bienvenu at 26:16-27:3, 61:24-62:18). Unlike Solis, the Safety Consultant conducted incident and accident investigations, on-site safety audits, and job safety analysis audits. (Ex. 20 at 27:10-24). Unlike Solis, the Safety Consultant supervises anywhere from three to thirty individuals who are other contractors. (Ex. 20 at 48:14-21). The compensation of a safety consultant ranged from $776 per day for LeDoux to $855-$873 per day for Bienvenu, far in excess of Solis'. (Ex. 18 at SOLIS[BIENVENU] 534-

---

[6]    (Ex. 18, B. Bienvenu Independent Contractor Agreement and Rate Sheets, Dep. of B. Bienvenu Ex.'s 7-9; Ex. 19, T. LeDoux Independent Contractor Agreement and 12/19/17 Rate Sheet, Solis[LeDoux, T] 839-41).

35; Ex. 19 at Solis[LeDoux, T] 839-41).

     5.     Swab Supervisor - Taylor[7]

When a well is drilled, it is typically "fracked" with a mixture of liquids to help the well begin to produce.  (Ex. 1 at ¶ 19).  "Swabbing" is the process by which this mixture of fluids is removed from the production zone of a fracked oil or gas well.  (Ex. 1 at ¶ 20).  This is necessary because as a well ages there may not be enough bottom hole pressure to return these fluids along with the oil and gas as is typical. (Ex. 1 at ¶ 21).  As the Swab Supervisor, and unlike Solis, Taylor was responsible for overseeing this process and ensuring it was done in a safe, productive, and efficient manner.  (Ex. 1 at ¶18, 22; Ex. 21 at CDF609-14).  Thus, unlike Solis, Taylor's role was primarily supervisory in nature.  (Ex. 1 at ¶ 22).  The compensation of a Swab Supervisor ranged from $750 per day to as high as $1000 per day, far in excess of Solis'.  (Ex. 21 at CDF609-14).

     6.     MWD Field Specialist - Moser

Unlike Solis, Moser worked on Pioneer projects. (Ex. 22, H. Moser 6/14/17 Independent Contractor Agreement and Rate Sheet, CDF11331-33; Ex. 23, H. Moser Client 8/8/17 Rate Sheet, CDF483-84).  A MWD is a type of tool that uses wellbore position, drill bit information, directional data, gyroscopes, magnetometers and accelerometers to take surveys used to determine the location of the drill bit in a well that is being directionally drilled (i.e., drilled at an angle other than straight up and down).  (Ex. 1 at ¶ 24).  Unlike Solis, the MWD Field Specialist runs and operates the MWD, monitors and troubleshoots any issues that arise, and qualifies the survey data to ensure it is accurate and complete.  (Ex. 1 at ¶ 25).

## IV.    SOLIS AND THE OPT-INS MADE VASTLY DIFFERENT DECISIONS REGARDING THEIR INDEPENDENT BUSINESSES

### A.    Structure of the Businesses

---

[7]    (Ex. 21, R. Taylor Independent Contractor Agreement and Rate Sheets, CDF609-14; Ex. 1 at ¶ 18).

Solis and the opt-in plaintiffs made entirely different decisions with respect to the structure and ownership of their businesses.  Solis is an experienced oilfield operator with nearly three decades of experience, including ten years as a Lead Operator.  (Ex. 3. at 31:17-20; Ex. 4). To better run his oilfield consulting business and to maximize tax advantages, Solis created Black Bull Oil and Gas Services LLC on October 13, 2016, and received compensation through this entity going forward.  (Ex. 3 at 52:2-5, 53:22-54:3, 332:18-333:2; Ex. 2 at HOEFLEIN[Solis, R]00147-154).  He continued to operate and receive payment through Black Bull until February 2020, long after he stopped utilizing Crescent as an invoicing company.  (Ex. 3 at 54:14-55:13; Joint Stipulation, Doc. No. 178 at ¶¶ 4-6).

Richard and LeDoux also operated as LLC's - but for the entirety of their time utilizing Crescent.  (Ex. 24, F. Richard 2016-2019 Tax Returns at 1517, 1625, 1674, 1755; Ex. 25, T. LeDoux 2018 Schedule C at SOLIS[Ledoux, T] 1328).  On the other hand, Crutcher and Woodson utilized single S-Corp's - (Ex. 26, H&CC Consultants 2016-2018 Tax Returns Form 1120S at CRUTCHER 2078, 2104, 2131; Ex. 27, T. Woodson 2016-2019 Tax Returns 1040 Schedule E at SOLIS[WOODSON, T] 3008, 3033, 3076, 3121) - while Bienvenu utilized two separate S-Corp.'s. (Ex. 20 at 39:24-40:17; Ex. 28, Burton Bienvenu LLC 2016-2019 Tax Returns Form 1120S at SOLIS[Bienvenu, B] 758, 774, 1259, 1289; Ex. 29, Sound Solutions LLC 2017-2019 Tax Returns Form 1120S at SOLIS[Bienvenu, B] 788, 1276, 1304).  Meanwhile, Alvarez, Bustamante, Johnson, Benn, Moser, and Taylor chose to operate as individuals, without the tax or risk-mitigation benefits of a separate legal entity.  (Ex. 30, S. Alvarez 2016-2019 Tax Returns; Ex. 31, J. Bustamante 2016-2019 Tax Returns; Ex. 32, B. Johnson 2016-2019 Tax Returns; Ex. 33, R. Benn 2016-2019 Tax Returns; Ex. 34, H. Moser 1099 at CDF15151; Ex. 35, R. Taylor 2016-2019 Tax Returns).

Solis chose to pay himself through Black Bull, necessitating the issuance of a W2 and the payment of employment taxes.  (Ex. 36, R. Solis 2016-2019 Tax Returns at HOEFLEIN[Solis,

R]0020).  However, Crutcher chose only to take distributions from his S-Corp. and did not pay salary or officer compensation, meaning he paid no payroll taxes and issued no W-2.  (Ex. 26 at CRUTCHER 2078, 2104, 2131).  Meanwhile, Bienvenu chose a middle ground, opting to pay some of his gross receipts as officer compensation (necessitating the issuance of a W2 and the payment of employment taxes) and the remainder as distributions to he and his wife.  (Ex. 28 at SOLIS[Bienvenu, B] 758, 763, 774, 780, 1259, 1265; Ex. 29 at SOLIS[Bienvenu, B] 788, 794,1276, 1282, 1304, 1309).

### B.    Diversification of the Businesses

Solis and the opt-in plaintiffs made differing decisions regarding what lines of business to pursue.  Solis, despite operating Black Bull, chose to focus exclusively on his oilfield services consulting line of business and did not pursue other revenue generating opportunities.  (Ex. 37, R. Solis Interrogatory Responses at #15).  Similarly, opt-ins Johnson and Crutcher did not diversity out of the oilfield and pursue other revenue streams.  (Ex. 38, B. Johnson Interrogatory Responses at #1; Ex. 39, H. Crutcher Interrogatory Responses at #1).   By contrast, Richard diversified into real estate and athletics training.  (Ex. 12 at 95:2-96:3, 128:8-17, 129:10-21).   Bustamante and Benn diversified into welding businesses.  (Ex. 13 at 43:4-44:21, 45:8-25, 92:2-18; Ex. 40, R. Benn Interrogatory Responses at # 1; Ex. 33, R. Benn 2018 Tax Transcript at SOLIS[Benn, R] 2749-80).  Taylor diversified outside of oilfield consulting by running a "cattle ranch business" in 2016 and he reported gross farm income of $114,849 in 2019. (Ex. 41, R. Taylor Interrogatory Responses at #1; Ex. 35 at SOLIS[TAYLOR, R] 3002).  Meanwhile, Bienvenu diversified out of the oilfield and earned income operating an equipment rental business with his wife.  (Ex. 42, B. Bienvenu 2016-2019 Tax Returns Schedule E at SOLIS[BIENVENU, B] 1452, 1466, 1481, 1496).

### C.    Investments, Profits, and Losses

Solis and the opt-in plaintiffs' individualized control over their respective business led to differences in the success of their businesses.  During his time running invoices through Crescent,

Solis' compensation was determined by Sanchez and ranged from $600/day to $650/day.  (Ex. 43, R. Solis Client Billable Rate Sheets; Ex. 3 at 96:4-7). Solis's pay increased from $600 to $650/day following a conversation with Jeremy Nursement, at which time he was informed he was doing good work.  (Ex. 3 at 136:1-14).  Crescent had nothing to do with his increase in compensation for his services for Sanchez.  (Ex. 3 at 95:8-16). Solis, through his entity Black Bull, generated revenues of $19,500, $17,426, $9,580, and $10,200 from 2016 to 2019.  (Ex. 36 at 0023-24, 0059-60, 0088-89; Joint Stipulation, Doc. No. 178).

Solis was much less successful in generating revenue in contrast to the opt-ins, some of whom had wildly differing levels of revenue, often much higher, in years that they operated their consulting business[8]:

| Name | 2016 | 2017 | 2018 | 2019 |
|------|------|------|------|------|
| Raul Solis | $40,300 | $17,426 | $9,580 | $10,200 |
| **Opt-ins** | | | | |
| R. Taylor | $134,175 | $172,850 | $127,000 | $0 |
| J. Bustamante | $56,500[9] | $196,768 | $95,807[10] | $0[11] |
| B. Johnson | $0[12] | $72,800 | $80,725 | $103,034 |
| H. Crutcher | $234,081 | $237,207 | $296,973 | $0 |
| F. Richard | $239,052 | $337,049 | $382,796 | $616,738 |
| T. Woodson | $6,019 | $295,888 | $268,006 | $171,507 |
| S. Alvarez[13] | $0 | $22,320 | $3,845 | $6,125 |
| R. Benn[14] | $12,849 | $16,150 | $66,790 | $0 |
| B. Bienvenu | $170,145 | $175,185 | $91,891 | $53,196 |
| T. LeDoux[15] | $0 | $0 | $18,624 | $0 |

---

[8]      (*See* Ex.'s 24-33, 35-36, 42).

[9]      Bustamante also earned W2 wages of $112,495 for oilfield work.  (Ex. 31 at 2016 Form 1040)

[10]     Bustamante also earned W2 wages of $95,807 for oilfield work. (Ex. 31 at 2018 Form 1040)

[11]     Bustamante also earned W2 wages of $20,071 for oilfield work. (Ex. 31 at 2019 Form 1040)

[12]     Johnson earned W2 wages of $75,807.  (Ex. 32 at 2016 1040).

[13]     Alvarez earned W2 wages for oilfield work in 2016, 2017, 2018, and 2019.  (Ex. 44, S. Alvarez Interrogatory Responses at #1).

[14]     Benn also earned W2 wages for oilfield work in 2016, 2017, and 2018.  (Ex. 33 at 2016-2018 Returns Form 1040).

[15]     LeDoux earned W2 wages for oilfield work in 2016 - 2019.  (Ex. 45, T. LeDoux Interrogatory Responses at #1).

As business owners, every year, each individual decided how much, and in what, to invest given their own personal desires and the needs of the business. Solis, through his entity Black Bull, made investments in his business - taking deductions of $15,170, $27,419, $68,018, and $53,877 from 2016 to 2019. (Ex. 36 at 0023-24, Transcript at Total Expenses, 0059-60, 0088-89). Solis and the opt-in plaintiffs made radically different decisions regarding investment amounts[16]:

| Name | 2016 | 2017 | 2018 | 2019 |
|------|------|------|------|------|
| Raul Solis | $39,176 | $27,419 | $68,018 | $53,877 |
| Opt-ins | | | | |
| R. Taylor | $134,175 | $172,850 | $128,482 | N/A |
| J. Bustamante | $33,660 | $120,972 | $70,540 | N/A |
| B. Johnson | N/A | $43,534 | $59,623 | $71,916 |
| H. Crutcher | $121,050 | $111,711 | $138,836 | N/A |
| F. Richard | $42,873 | $168,642 | $179,219 | $316,041 |
| S. Alvarez | N/A | $23,508 | $9,530 | $13,896 |
| R. Benn | $11,106 | $11,696 | $67,397 | N/A |
| B. Bienvenu | $117,698 | $108,641 | $73,274 | $96,142 |
| T. LeDoux | N/A | N/A | $3,582 | N/A |

These decisions with respect to investment amounts led to wildly divergent profit margins. In sum, Solis and the opt-in plaintiffs differ in almost every way imaginable. They are similar only in that each signed an agreement with Crescent in which they agreed they were an independent contractor, they all deducted businesses expenses and paid taxes as independent contractors in years they operated, and none of them had any day-to-day contact with Crescent with respect to their job duties. There are no factual similarities upon which this case could be collectively tried.

## ARGUMENT

## I.    LEGAL STANDARD UNDER *SWALES V. KLLM TRANSP. SERV., LLC.*

The Court's analysis regarding whether to allow this case to proceed as a collective action or decertify is governed by *Swales v. KLLM Transp. Servx., L.L.C.,* 985 F.3d 430 (5th Cir. 2021). Previously, the majority of courts in this Circuit applied a two-step inquiry under *Lusardi* with a

---

[16]    (*See* Ex.'s 24-33, 35-36, 42).

"lenient" standard for conditional certification at step one and a heightened standard at the second stage where the court analyzed whether plaintiffs and opt-in plaintiffs are "similarly situated." *Segovia v. Fuelco Energy LLC*, 2021 WL 2187956, at *6 (W.D.Tex., 2021). Indeed, that two-step analysis is what occurred in this case, as conditional certification was granted on April 21, 2020. (Doc. No. 43). However, per *Swales*, this two-step process is no longer appropriate.

Under *Swales*, district courts must "rigorously scrutinize the realm of similarly situated and must do so from the outset of the case, not after a lenient step-one conditional certification." *Swales*, 985 F.3d at 434. This rigorous scrutiny is necessary so that district courts can provide "a workable gatekeeping framework for assessing … before notice is sent to potential opt-ins, whether putative plaintiffs are similarly situated--***not abstractly but actually***." *Id.* at 433 (emphasis added). In performing this duty, the Fifth Circuit noted that it necessarily requires a consideration, but not endorsement of, the merits of the case. *Id.* at 442. **A consideration of "all available evidence" is required when determining whether the merits question can be solved collectively.** *Id.* at 444. The court also emphasized that it is the plaintiff's burden of establishing similarity, noting the requirement "follows from the general burden that a plaintiff bears to prove her case … a plaintiff should not be able to simply dump information on the district court and expect the court to sift through it and make a determination as to similarity." *Id.* at n.65. Thus, under *Swales*, "the district court proceeds directly to step two of *Lusardi* - the 'similarly situated' inquiry - with the benefit of pre-certification discovery if needed. *Alvarez v. NES Global LLC*, 2021 WL 3571223, at *2 (S.D.Tex., 2021). In evaluating whether Solis has met his burden in demonstrating that the collective members are in fact "similarly situated," the Court should consider "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to [defendant] which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations."

14

*Portillo v. Permanent Workers, L.L.C.*, 662 F. App'x 277, 281 (5th Cir. 2016).

Here, the case was conditionally certified prior to the issuance of *Swales*.  (Doc. No. 43).

Thus, while the Motion is properly viewed as a Motion to Decertify, the standard is the same as if

the Court was first considering the issue of notice.  *Alvarez*, 2021 WL 3571223, at *2.  In other

words, this case never should have been conditionally certified in the first place.

## II.   THERE ARE DISPARATE FACTUAL DIFFERENCES IN THE WORK (JOB ROLES) PERFORMED BY SOLIS AND THE OPT-INS

In evaluating whether Solis has met his burden that the collective members are in fact

"similarly situated," the first factor the Court should consider is whether "(1) the disparate factual

and employment settings of the individual plaintiffs" are similar.  In particular, "the proposed class

members [must be] similarly situated in terms of job requirements … Thus, the relevant inquiry

for the court is whether the proposed class members performed the same basic tasks." *Mathis v.

Stuart Petroleum Testers, Inc.*, No. 5:16-cv-094-RP, 2016 WL 4533271, at *2 (W.D. Tex. Aug.

29, 2016).  "[I]f the job duties among potential members of the class vary significantly, then class

certification should not be granted." *Dreyer v. Baker Hughes Oilfield Operations, Inc.*, No. H–08–

1212, 2008 WL 5204149, at *2 (S.D.Tex. Dec. 11, 2008).  Whether Solis and the opt-in plaintiffs

performed the same basic tasks is no different in cases involving independent contractors.

*Richard,* 2021 WL 2492472, at *2 (granting motion for decertification because, among other

things, "the ways distributors accomplish their jobs are different.").

In this case, there are seven separate and distinct jobs at issue, in addition to Solis' job as

a Production Lead.  It must also be emphasized again, **there is currently no named Plaintiff

representing the Pioneer opt-ins**.

| __NAME__ | __ROLE__ | __OPERATOR__ |
|---|---|---|
| Raul Solis | Production Lead Operator | Sanchez |

| Robert Taylor | Swab Supervisor | Sanchez |
|---|---|---|
| Juan Bustamante | Maintenance Foreman | Sanchez |
| Bruce Johnson | Automation Technician | Sanchez |
| Herman Crutcher | Wellsite Manager | Pioneer |
| Fernando Richard | Wellsite Manager | Sanchez |
| Tracy Woodson | Wellsite Manager | Sanchez |
| Sergio Alvarez | Wellsite Manager | Sanchez |
| Hank Moser | MWD Field Specialist | Pioneer |
| Ryan Benn | Automation Tech | Sanchez |
| Burton Bienvenu | Safety Consultant | Sanchez |
| Toby LeDoux | Safety Consultant | Sanchez |

Evidence abounds with respect to the differences between Solis as a Production Lead and the current members of the collective who held radically different roles within the oilfield.   As the Production Lead, Solis monitored and maintained the production equipment at the various well sites to which he was assigned. (Ex. 3 at 168:10-169:18, 170:1-172:15, 220:4-221:24). Specifically, his subordinates collected production data for him to analyze and, if he identified a problem, he would either instruct his subordinates to fix the problem or escalate the problem to Jeremy Nursement, Sanchez Superintendent.   (Ex. 3 at 168:10-169:18, 170:1-172:15, 220:4-221:24).   Indeed, Solis' testimony is clear; he did not perform any of the roles—Swab Supervisor, Maintenance Foreman, Flowback Consultant, MWD Field Specialist, Automation Technician, or Company Man/WSM—performed by the opt-in plaintiffs in this litigation.   (Ex. 3 at 123:12-17, 124:1-126:8).

By contrast, the WSM (Crutcher, Alvarez, Richard, and Woodson) was the primary representative of the operator on site and oversaw all operations at an individual wellsite, including the work of all other individuals at the particular wellsite.   (Ex. 12 at 53:5-13, 56:9-24).   Unlike Solis, the Maintenance Foreman (Bustamante) performed a primarily mechanical job and fixed the various equipment found at a well site. (Ex. 13 at 30:4-18, 31:2-10, 31:22-32:14, 33:1-11, 38:20-39:9).   Unlike

Solis, the Automation Technician position (Johnson and Benn) is a highly technical, computer-oriented programming position requiring that various programming, inspection, and troubleshooting tasks be performed on remote operations controllers and the various sensors measuring the output of oil and liquids. (Ex. 15 at 47:25-48:5, 48:14-49:3, 88:4:16). Unlike Solis, the Safety Consultants (Bienvenu and LeDoux) were strictly confined to issues of safety and ensured all personnel and equipment operated within regulatory guidelines, developing plans of action with respect to safety and health, and ensuring compliance with health and safety policies and legal requirements. (Ex. 20 at 26:16-27:3, 61:24-62:18). Unlike Solis, the Swab Supervisor (Taylor) was strictly confined to supervision of the swab process by which fracking fluids are removed from the production zone of an oil or gas well. (Ex. 1 at ¶ 20). Unlike Solis, the MWD Field Specialist (Moser) was strictly confined to the operation of the MWD, a device used in the actual drilling of an oil or gas well. (Ex. 1 at ¶¶ 23-25).

Differences even abound with respect to only the opt-in plaintiffs. For example, Alvarez, Crutcher, Richard, and Woodson as the WSM were responsible for the overall activity at any one rig. (Ex. 12 at 53:5-13, 56:9-24, 81:1-10). By contrast, individuals such as Solis, Bienvenu, Bustamante, LeDoux, Johnson, Benn, Taylor, and Moser were responsible for discrete areas - maintaining well equipment and analyzing production data (Solis); identifying and fixing mechanical issues (Bustamante), safety (Bienvenu and LeDoux), programming computers and ensuring production data is captured (Johnson and Benn), the "swab" process (Taylor), and MWD (Moser). (Ex. 1 at ¶¶ 18-25; Ex. 3 at 168:10-169:18, 170:1-172:15, 220:4-221:24; Ex. 13 at 30:4-18, 31:2-10, 31:22-32:14, 33:1-11, 38:20-19:9, 103:10-16, 107:8-14; Ex. 20 at 26:16-27:3, 27:10-24, 61:24-62:18; Ex. 15 at 47:25-48:5, 48:14-49:3, 88:4-16, 89:8-90:24). Indeed, **the only unifying characteristic amongst all of the opt-in plaintiffs is that none of them were responsible for the maintenance and operation of the production equipment, like Solis as production lead.**

Differences are also present with respect to the level of supervisory control Solis and the opt-in plaintiffs enjoyed.  Solis supervised about six individuals during his time working on Sanchez projects.  (Ex. 3 at 142:22-143:24).  However, some opt-in plaintiffs enjoyed significantly more supervisory responsibility.  Crutcher, Alvarez, Richard, and Woodson, as the WSM's, were responsible for all operations at an individual wellsite and supervised anywhere from 40 to 100 individuals at any given time. (Ex. 12 at 53:5-13, 56:9-57:15).  Bustamante testified that 15 to 30 individuals reported to him as the Maintenance Foreman on Sanchez projects.  (Ex. 13 at 39:12-25).   Meanwhile, Benn and Johnson, as Automation Technicians, enjoyed no supervisory responsibilities and had no subordinates.  (Ex. 15 at 85:16-19, 97:14-18).

Under *Swales*, the Court must give weight to these differences as they bear on Crescent's defenses, and other courts, when faced with such distinctions, have found them to be dispositive at certification and refused to certify collectives with disparities in responsibilities, skills, and levels of involvement with respect to the alleged employer.  *Richard*, 2021 WL 2492472, at *2 (granting motion for decertification under *Swales* and noting "the ways distributors accomplish their jobs are different, each distributor's relationship with his superiors is unique…).

**III.    THE DEFENSES APPLICABLE TO SOLIS AND THE OPT-INS ARE DIFFERENT**

  **A.    <u>Independent Contractor Collective Actions Are Rarely Certified Because the Economic Realities Test Requires Individualized Evidence</u>**

The second factor the Court should consider at this stage is whether "the various defenses available to [defendant] appear to be individual to each plaintiff".  Here, Crescent's defense is that they are independent contractors.  Thus, the primary issue at the heart of this Motion is whether Solis' and the opt-in plaintiffs' status as independent contractors can be evaluated on a collective-wide basis pursuant to the economic realities test.  This test employs five non-exclusive factors: "(1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or

loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship". *Parrish v. Premier Directional Drilling, L.P.,* 917 F.3d 369, 379 (5th Cir. 2019). "The determination of whether an individual is an employee or independent contractor is _highly dependent on the particular situation presented_." *Thibault v. Bellsouth Telecommunications, Inc.*, 612 F.3d 843, 848 (5th Cir. 2010) (emphasis added).

Given this, it is not surprising that the Fifth Circuit in *Swales* made note that "the individualized nature of the economic-realities test is why misclassification cases rarely make it to trial on a collective basis." *Swales*, 985 F.3d at 442.   It is immaterial, as Plaintiffs will likely allege, that Solis and the various opt-ins in this case were allegedly subject to a blanket independent contractor classification because "despite being jointly subject to an alleged misclassification … if the economic realities test requires different proof and is unlikely to produce the same result for each plaintiff in the collective, certification is not appropriate."  *Id; see also Richard v. Flowers Foods, Inc.*, No. CV 15-2557, 2021 WL 2492472, at *2 (W.D. La. Apr. 9, 2021).

It must be emphasized - if this Court were to allow this case to proceed as a collective action it would be an extreme outlier.  *See e.g., Richard*  2021 WL 2492472, at *2 (W.D. La. Apr. 9, 2021) (Granting motion for decertification in independent contractor FLSA action); *Clay v. New Tech Glob. Ventures, LLC,* No. CV 16-296-JWD-CBW, 2019 WL 1028532, at *11 (W.D. La. Mar. 4, 2019) ("Courts rarely grant final certification of a collective of plaintiffs alleging that they were improperly classified as independent contractors."); *see also Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d. 977, 1003 n.182 (D. Kan. 2018)(gathering cases and finding "[c]ourts typically deny collective certification" in misclassification cases "because the proof necessary to determine whether the putative plaintiffs are employees or independent contractors cannot generally be applied to a class as a whole"); *Harris v. Express Courier Int'l, Inc.*, No. 5:16-CV-05033, 2017 WL 5606751, at

*5 (W.D. Ark. Nov. 21, 2017); *Pena v. Handy Wash, Inc.*, 2015 WL 11713032, at *3 (S.D. Fla. 2015) ("Courts have typically denied collective certification of FLSA actions which allege employee / independent-contractor misclassification[.]"); *Carrera v. UPS Supply Chain Solutions, Inc.*, No. 10-60263, 2012 WL 12860750, *8 (S.D. Fla. 2012) (same); *Lasseter v. Restaurant Delivery Developers, LLC*, No. 8:18-cv-1912-T-33TGW, 2018 WL 4091987, *2 (M.D. Fla. Aug. 28, 2018) (granting decertification because "the FLSA economic realities test could not be applied collectively in this case"); *Roberson v. Restaurant Delivery Developers, LLC*, 2018 WL 3056183 (M.D. Fla. Jun. 20, 2018) (same); *Adami v. Cardo Windows, Inc.*, No. 12-2804, 2016 WL 1241798, *7 (D.N.J. Mar. 30, 2016); *Griffith v. Fordham Fin. Mgmt., Inc.*, No. 12-cv-1117, 2016 WL 354985, *3 (S.D.N.Y. Jan. 28, 2016); *Dang v. Inspection Depot, Inc.*, No. 14-61857, 2015 WL 11598702, *2 (S.D. Fla. Nov. 6, 2015) ; *Shayler v. Midtown Investigations, Ltd.*, No. 12 cv 4685 (KBF), 2013 WL 772818, *9 (S.D.N.Y. Feb. 27, 2013); *Spellman v. Am. Eagle Exp., Inc.*, No. CIV.A. 10-1764, 2013 WL 1010444, at *5 (E.D. Pa. Mar. 14, 2013).

While a few independent contractor cases have survived certification following *Swales*, each is readily distinguishable because tax returns were not provided as evidence in these cases. For example, in *Torres v. Chambers Protective Services, Inc.*, Chambers failed to present the Court with evidence of the plaintiffs' relative investments and opportunities for profit and loss via their tax returns. 2021 WL at *8 (N.D. Tex. Aug. 5, 2021). Similarly, in *Sterling v. Greater Houston Transp. Co.*, an analysis of the plaintiffs' tax returns and business entities appears to have not been conducted. 2021 WL 2954663, at *3 (S.D. Tex. July 14, 2021). Unlike these cases, an analysis of Solis' and the various opt-ins' tax returns show stark differences. In *Badon v. Berry's Reliable Resources*, counsel for Berry's admitted that at least some portion of the putative collective was similarly situated, and the court emphasized that the small number of plaintiffs (only six)

outweighed the risk "that the case will quickly devolve into a cacophony of individual actions." 2021 WL 933033, at *3 (E.D. La. Mar. 11, 2021).  In contrast, this case does not have a small number of plaintiffs as there are twice the number of opt-in plaintiffs.

It is not enough that Solis demonstrate **some** commonality as to **some** of the factors; numerous courts have decertified collective actions even when there is common evidence as to as many of three of the factors.  *Blair*, 309 F. Supp. 3d. at 1009; *Harris*, 2017 WL 5606751 at *5; *Carrera*, 2012 WL 12860750 at *8 (even though some factors "might be capable of proof on a class-wide basis, the court finds than any uniformity in proof among those factors fails to offset the evidentiary variation" in the other factors).

### B.     No Common Proof of Control

In examining the "control" factor, courts consider whether the plaintiffs are free to accept or reject jobs, whether they are free to engage in other business activities, whether plaintiffs set their own schedules, and whether their day-to-day activities were supervised by the alleged employer. *Parrish,* 917 F.3d at 381 ("This means we determine whether the worker has a "viable economic status that can be traded to other ... companies.") (internal citations omitted); *Thibault,* 612 F.3d at 846-47; *Carrell v. Sunland Const., Inc.,* 998 F.2d 330, 334 (5th Cir. 1993).  Evidence of control differs wildly amongst Solis and the individuals who have opted into this litigation.

First, there is differing evidence between Solis and the opt-in plaintiffs with respect to the engagement in other businesses.  Solis chose to focus exclusively on his oilfield services consulting line of business.  (Ex. 37 at #15).  However, Richard diversified into many different businesses in an attempt to diversify his revenue stream, including real estate and athletics training. (Ex. 12 at 95:2-96:3, 128:8-17, 129:10-21).  Similarly, Bustamante diversified into two separate welding businesses (Ex. 13 at 43:4-44:21, 45:8-25, 92:2-18) while Benn only operated one welding business. (Ex. 40 at # 1; Ex. 33 at R. Benn 2018 Tax Transcript).  Taylor chose to diversify away

from the oilfield by operating farms or cattle ranches and earning in excess of $100,000 in some cases. (Ex. 41 at #1). Finally, opt-in Bienvenu diversified out of the oilfield and earned income operating an equipment rental business with his wife. (Ex. 42 at SOLIS[BIENVENU, B] 1452, 1466, 1481, 1496). This evidence demonstrates that some members of the collective had full control over their business operations and that Crescent had no control, making the economic realities test highly individualized and not appropriate for collective treatment.

Second, there is conflicting evidence amongst Solis and the opt-in plaintiffs with respect to the amount of control Crescent had over their day-to-day activities. On the one hand, Solis testified that no one from Crescent told him how to do his job as Production Lead from September through December 2016, and that he never called Crescent at any time to ask how to do his job. (Ex. 3 at 79:1-12). By contrast, Bienvenu testified that his conduct was governed by a safety and regulations manual provided to him by Crescent. (Ex. 20 at 128:10-132:25). Indeed, there is differing testimony regarding who exercised control at all. Solis testified that he reported to Kevin Langen, another independent oilfield consultant, or Sanchez well site manager/superintendent Jeremy Nursement. (Ex. 3 at 111:2-5, 122:19-123:11). Meanwhile the WSM's reported to different Sanchez representatives than Solis - Superintendents Bill Mortarello, Jimmy Strubhard, Tom Henson, Robert Chavara, Dale Blocker, Dan Machachu, Joey Bateman, and Lee Chandler. (Ex. 12 at 54:6-55:17).

Third, there is conflicting evidence amongst Solis and the opt-in plaintiffs with respect to their ability to freely accept or reject work. Solis testified that he understood that he was free to accept or reject any job or project that was offered by Crescent. (Ex. 3 at 126:13-19). Bustamante agreed that he was free to accept or reject any job or project that was offered by Crescent. (Ex. 13 at 62:11-15). By contrast, Richard testified that he could not accept or reject any project and would have been "fired" if he had done so. (Ex. 12 at 23:4-24:17). Johnson offered similar testimony

stating that he could not turn down projects. (Ex. 15 at 78:23-80:25). There is also divergent evidence amongst Solis and the opt-in plaintiffs regarding the manner in which they came to run their invoices through Crescent with Solis initially running his Sanchez work through Crosby before transitioning to Crescent and opt-ins such as Bienvenu, Bustamante, Johnson, and Richard testifying that Sanchez contacted them about doing work for Sanchez, either because of a pre-existing relationship between the parties or their reputation in the oilfield. (Ex. 20 at 124:22-25; Ex. 13 at 40:8-41:3, 100:11-5; Ex. 12 at 62:12-64:3; Ex. 15 at 63:21-64:20). Such differences foreclose collective treatment. *Fuller v. Jumpstar Enter.'s, LLC*, NO:H-20-1027, 2021 WL 5771935 at *8 (S.D. Tex., Dec. 6, 2021) (denying *Swales* motion given differing evidence regarding the manner in which plaintiffs initiated their relationship with the alleged employer).

### C.   No Common Proof Of Profits And Loss

In evaluating plaintiffs' opportunities for profit or loss, courts consider facts such as whether plaintiffs wrote off business expenses on their tax returns, and whether plaintiffs generated revenue from sources other than the alleged employer. *Carrell*, 998 F.2d at 333 (focusing on "year-end profits or losses"); *Thibault*, 612 F.3d at 848 ("The splicers here increased profits by controlling costs (repairs, supply costs, food, water, housing, etc.)"). The *Parrish* court noted "evidence gleaned from tax returns can be useful" when determining the profits and loss factor and found losses from other businesses to be just as probative as profits. 917 F.3d at 384 ("[W]e consider the losses sustained by plaintiffs' enterprises, such as the goat farm, as a part of the overall analysis of how dependent plaintiffs were on Premier."). Here, there is no common evidence capable of resolving whether the profit/loss factor weighs in favor of or against independent contractor status.

First, evidence differs drastically with respect to whether Solis and the opt-in plaintiffs generated revenue from other sources. Solis chose to focus exclusively on his oilfield services consulting line of business and did not pursue other revenue generating opportunities. (Ex. 37 at #15).

By contrast, many opt-in plaintiffs diversified into non-oilfield areas of revenue generation. Richard diversified into real estate and athletics training. (Ex. 12 at 95:2-96:3, 128:8-17, 129:10-21). Bustamante and Benn generated revenue via their welding activities. (Ex. 13 at 43:4-44:21, 45:8-25, 92:2-18; Ex. 40 at # 1; Ex. 33 at SOLIS[Benn, R] 2749-80).   Taylor ventured even further from the oilfield and ran a "cattle ranch business" which reported gross farm income of $114,849 in 2019.  (Ex. 41 at #1; Ex. 35 at SOLIS[TAYLOR, R] 3002).  Bienvenu operated an equipment rental business with his wife.   (Ex. 42 at SOLIS[BIENVENU, B] 1452, 1466, 1481, 1496).   Thus, some plaintiffs were able to control their profits and losses by diversifying into other business ventures while others relied solely on their oilfield work.  *Clay,* 2019 WL 1028532, at *12 (Granting Motion for Decertification because evidence showed some plaintiffs diversified into other business ventures).

Second, there is differing evidence with regard to Solis' and the opt-ins' ability to generate profits outside of their relationship with Crescent.  Solis generated revenues of $40,300 during his time with Crescent ending December 2016.   (Ex. 36 at HOEFLEIN[Solis, R.] 23, 25).   However, he struggled to generate revenues for Black Bull following the end of the relationship and only generated revenues of $17,426, $9,580, and $10,200 from 2017 to 2019, respectively. (Joint Stipulation, Doc. No. 178). By contrast, opt-ins such as Crutcher and Richard had their highest years of revenue in 2018 and 2019 earning $296,973 and $616,738 following the cessation of their relationship with Crescent, respectively.  (Ex. 26 at CRUTCHER 2131; Ex. 24 at  1755).

Third, evidence differs wildly with respect to whether Solis and the opt-in plaintiffs did or even could negotiate their pay.  Solis testified that Sanchez determined his rate, and it was non-negotiable.  (Ex. 3 at 94:12-14).  By contrast, Johnson testified that he did negotiate his rate with both Sanchez **and** Crescent.  (Ex. 15 at 66:2-17, 67:18-24, 69:4-7, 77:9-78:6).  Bienvenu testified that he did not negotiate his daily rate with Crescent or Sanchez but testified that Crescent made

the decision to "bump up [his] pay" at one point. (Ex. 20 at 45:14-47:16). Opt-in Richard testified that he tried to negotiate his rate with Sanchez but was unsuccessful. (Ex. 12 at 63:14-64:24). These distinctions alone weigh in favor of decertification. *See Harris*, 2017 WL 5606751 at *6.

Finally, the evidence differs wildly with respect to the levels of success Solis and the opt-in plaintiffs' businesses enjoyed. Solis earned revenues of $40,300, $17,426, $9,580, and $10,200 against investments of $39,176, $27,419, $68,018, and $53,877 from 2016 to 2019.   (Ex. 36 at 0023-24, 2017 Tax Transcript at Total Expenses, 0059-60, 0088-89; Joint Stipulation Doc. No. 178). **In other words, Solis invested in his business to such a degree that he was only profitable in 2016 with a 22% margin and did not make a profit in 2017-2019.** (*Id.*).  This is a significant contrast to opt-in plaintiffs Bustamante, Johnson, Crutcher, Richard, Benn, Bienvenu, and LeDoux, all of whom were profitable every year they operated their businesses. (*See* Ex.'s 24-33, 35-36, 42).  Indeed, Richard made profit margins ranging from 49% (2019) to a whopping 82% (2016), despite investing an average of $176,693 in his consulting business from 2016 - 2019.  (Ex. 24 at 1517, 1625, 1674, 1755).  On the other hand, other opt-ins such as Bienvenu had wildly divergent profit margins ranging from -44% (2019) to 61% (2017) as a result of his choices regarding investments in his consulting business.  (Ex. 28 at SOLIS[Bienvenu, B] 758, 774, 1259, 1289; Ex. 29 at SOLIS[Bienvenu, B] 788, 1276, 1304).).

## D.    No Common Proof of Investments in Their Businesses

In evaluating Plaintiffs' investments in their businesses, the Court determines whether Plaintiffs have made the kinds of investments indicative of one who is in business for himself. *See Carrell*, 998 F.2d at 333-34 (recognizing that "Sunland's overall investment in each pipeline construction project was obviously significant" but finding determinative the fact that "Welders supplied their own welding equipment; and their investments in welding equipment averaged $15,000 per Welder.").  In *Clay*, the court found important that "the plaintiffs' businesses produced

varying levels of revenue, which resulted in different levels of investment in their businesses" in granting decertification. 2019 WL 1028532 at *12.   Here, stark differences are apparent.

First, the evidence differs drastically with respect to the level of investment Solis and the opt-in plaintiffs placed in their respective businesses.   Solis invested $39,176, $27,419, $68,018, and $53,877 for an average of $47,123 in his business from 2016 to 2019.  (Ex. 36 at 0023-24, Transcript at Total Expenses, 0059-60, 0088-89).   By contrast, the average levels of investment for the opt-in plaintiffs ranged wildly with only one opt-in (Johnson) investing within 20% of the amount Solis did[17]:

| Opt-in Plaintiff | Average Level of Investment |
|---|---|
| R. Taylor | $145,169 |
| J. Bustamante | $75,057 |
| B. Johnson | $58,358 |
| H. Crutcher | $123,866 |
| F. Richard | $176,694 |
| S. Alvarez | $15,645 |
| R. Benn | $30,066 |
| B. Bienvenu | $98,939 |
| T. LeDoux | $3,582 |

Further, the average investment of all the opt-in plaintiffs amounts to $80,819, a level 71.5% percent higher than that of Solis.  (See Ex.'s 24-33, 35-36, 42 at Schedule C and Form 1120S).   In other words, the average opt-in plaintiff invested 71.5% more in his business than Solis did in Black Bull during their respective years in operation. (Id.).

Second, there is a wide divergence with respect to the kinds of investments made by Solis and the opt-in plaintiffs.  For example, Solis primarily invested in depreciable property with a total amount of $93,681 from 2016 to 2019 and $4,290 in contract labor in 2016.  (Ex. 36 at 27-28, 2017 Transcript at Depreciation, 62-63, 95-96).   By contrast, Crutcher invested significantly more - $305,000 in

---

[17]     (See Ex.'s 24-33, 35, 42 at Schedule C and Form 1120S).

"buildings and other depreciable assets" from only 2016 to 2018. (Ex. 26 at CRUTCHER 2081, 2107, 2134). In yet another difference, Crutcher had no investment in wages or contract labor.  (Ex. 26 at CRUTCHER 2078, 2104, 2131).   Meanwhile, and unlike Solis, Bienvenu had no investments in buildings and other depreciable assets from 2016 to 2019.  (Ex. 28 at SOLIS[BIENVENU, B] 761, 777, 1262, 1292; Ex. 29 at SOLIS[BIENVENU, B] 791, 1279, 1307).  Again, unlike Solis, other opt-ins such as Bustamante did not invest in depreciable assets but instead chose to focus on vehicles used in furtherance of their consulting business.  (Ex. 31 at SOLIS[BUSTAMANTE, J] 3230, 3161, 3169, 3177).   Finally, unlike Solis, some opt-ins such as Bienvenu, decided to continue operating and investing in an entity even after the entity stopped generating revenue - Bienvenu's S-Corp. Burton Bienvenu LLC had no revenue from 2018 to 2019 yet he still invested $18,672 and $19,766 in the business, respectively.  (Ex. 28 at SOLIS[Bienvenu, B] 1259, 1289).

Third, Solis and the opt-in plaintiffs made differing decisions regarding whether to utilize and compensate individuals who assisted them in their businesses.  Solis, for example, did not have any employees (other than himself) working for Black Bull.  (Ex. 3 at 126:20-23).   By contrast, Bienvenu paid himself and his wife officer compensation as officers of his businesses and his wife assisted him in running his business.  (Ex. 20 at 64:23-65:11; Ex. 28 at Form 1120S; Ex. 29 at Form 1120S).  Similarly, Richard utilized his son and his wife as contract labor and they assisted him in running the day to day operations of his LLC, F&T Oil and Gas Consulting.  (Ex. 12 at 103:7-104:10, 149:17-150:1).  Others such as Crutcher, chose neither to employ themselves or others via their businesses.  (Ex. 26 at  CRUTCHER 2078, 2104, 2131).  These decisions had varying consequences. Solis' decision to employ himself through Black Bull necessitated the issuance of a W2 and the payment of employment taxes.  (Ex. 36 at HOEFLEIN[Solis, R]0020). On the other hand, because Crutcher chose only to take distributions from his S-Corp. and did not

employ himself or others, he did not have to pay employment taxes and did not receive a W-2. (Ex. 26 at CRUTCHER 2078, 2104, 2131).

    **E.**    <u>**No Common Proof of Skill/Initiative**</u>

In examining the skills/initiative factor, the Court considers each Plaintiff's experience, training, and ability to generate revenues or profits through business initiative, such as by forming separate business entities and affirmatively seeking work from alternative sources. *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1312 (5th Cir. 1976) (question is whether workers have "viable economic status that can be traded to other . . .companies"); *Eberline v. Media Net, L.L.C.*, 636 F. App'x 225, 228 (5th Cir. 2016) (court should look for some unique skill set or some ability to exercise significant initiative within the business"). As noted *infra* in Section IV, Solis and the opt-in plaintiffs showed different levels of business initiative because some formed their own separate business entities, while others did not, and each had varying levels of success as a result of their individual initiatives.  This alone weighs in favor of decertification.[18]

Solis and the opt-in plaintiffs occupy a wide range on the oilfield hierarchy with respect to the skill set required by each of their unique positions.  Opt-ins Richard, Crutcher, Woodson and Alvarez, are at the top of the hierarchy in their role as  WSM, the primary representative of the operator on site who oversees all operations at an individual wellsite, including the work of all other individuals who are at the particular wellsite.  (Ex. 12 at 53:5-13, 56:9-24).  The WSM supervises and oversees anywhere from 40 to 100 individuals at any given time.  (Ex. 12 at 56:25-57:15).  The WSM is an office job and he primarily works out of an office trailer with a computer.  (Ex. 12 at

---

[18]    *Clay,* 2019 WL 1028532 at *12 ("[T] mere fact that some plaintiffs had their own business entities while others did not may, by itself, be significantly relevant to this and other factors … The plaintiffs' varying revenues, investments, and different decisions with respect to whether to establish independent business entities (and engage in outside work) could lead to disparate results regarding each plaintiff's level of economic dependence on New Tech.").

53:10-19).  By contrast, Solis, as a Production Lead, reported to the WSM, only supervised around six individuals, and spent the majority of his day in his truck.  (Ex. 3 at 11:2-5, 122:19-123:11, 216:1-8).  Other positions, such as Maintenance Foreman, were primarily responsible for ensuring that the mechanical aspects of the well equipment operated smoothly, and supervised between fifteen and thirty individuals.  (Ex. 13 at 30:4-18, 31:2-10, 31:22-32:14, 33:1-11, 38:20-39:25).  Others, such as Johnson and Benn in the Automation Technician role, performed primarily computer and programming work and did not supervise anyone. (Ex. 15 at 47:25-48:5, 48:14-49:3, 85:16-19, 88:4:16, 89:8-90:24, 97:14-18).   Given these drastic differences, decertification is appropriate. *Richard*, 2021 WL 2492472, at *2 (granting motion for decertification because, among other things, "the ways distributors accomplish their jobs are different.").

Third, Solis and the opt-in plaintiffs showed varying levels of initiative in finding their revenue generating activities.  For example, Solis testified that he heard about an opportunity for Sanchez from a mutual friend and then interviewed with Sanchez employee Jeremy Nursement in 2015 after he reached out to them.  (Ex. 3 at 42:6-43:23).  In turn, Sanchez informed Solis that they would like to use Crosby as an invoicing company which then transitioned to Crescent in September 2016.  (Ex. 3 at 49:22-51:1).  By contrast, opt-ins Bienvenu, Bustamante, Johnson, and Richard testified that Sanchez contacted them about doing work for Sanchez due to a pre-existing relationship between the parties or because of their reputation in the oilfield. (Ex. 20 at 124:22-25; Ex. 13 at 40:8-41:3, 100:11-5; Ex. 12 at 62:12-64:3; Ex. 15 at 63:21-64:20).  Opt-in's Moser and Crutcher had no contact with Sanchez at all given that they only worked on Pioneer projects.  (Ex. 22 at CDF11331-33; Ex. 23 at CDF483-84; Ex. 8 at CDF6790-6792).  Rather, with respect to Moser, Pioneer contacted Crescent directly regarding on-boarding him to  Pioneer projects. (Ex. 46, H. Moser email, CDF11316).

## F.   <u>No Common Proof of Permanency</u>

In evaluating the permanency factor, the Court considers whether the relationship was

project-based and nonexclusive. *See Thibault*, 612 F.3d at 846; *Carrell*, 998 F.2d at 332.   Solis and the opt-in plaintiffs utilized Crescent as an invoicing company for various lengths of time, from just two weeks to up to two years.   The individualized nature of finding their own projects and differing success experienced in dictating their rate also led to significant differences in time spent utilizing Crescent as an invoicing company: Taylor (20 months), Bustamante (22 months), Solis (4 months), Johnson (24 months), Crutcher (7 months), Richard (13 months), Woodson (15 months), Alvarez (two weeks), Moser (six months), Benn (one month), Bienvenu (12 months), and LeDoux (one month).   (Ex. 1 at ¶ 26).   Thus, no single individual (or even subset of individuals) can offer collective-wide testimony in regard to the permanence factor.

## IV.   OPT-IN PLAINTIFFS WILL NOT BE PREJUDICED BY DECERTIFICATION

Solis and the opt-in plaintiffs will likely argue that they will be prejudiced by decertification because proceeding collectively will be less expensive for each of them.   However, this is irrelevant because it is a fact of **every** collective action.   Plaintiffs' cost savings cannot justify proceeding collectively at the expense of judicial efficiency and Crescents' due process rights.   *See Rodriguez v. Niagara Cleaning Servs., Inc.,* No. 09-22645, 2010 WL 11505505 at *5 (S.D. Fla. Dec. 14, 2010) ("While, surely, pooling the resources of the individual plaintiffs with small claims benefits those plaintiffs, the Court must also determine whether trying such claims together is an efficient use of the Court's resources.").

## CONCLUSION

For all the foregoing reasons, Crescent requests that the Court grant its Motion for Decertification, decertify this action, and dismiss all opt-in plaintiffs.

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on March 2, 2022, I electronically filed the foregoing Motion for Decertification a through the Court's CM/ECF system effectuating service on the below:

Richard J. (Rex) Burch
David J. Moulton
Bruckner Burch PLLC
8 Greenway Plaza, Suite 1500
Houston, TX 77046
rburch@brucknerburch.com
dmoulton@brucknerburch.com


Michael A. Josephson
Andrew W. Dunlap
Richard M. Schreiber
Josephson Dunlap LLC
11 Greenway Plaza, Suite 3050
Houston, TX 77046
mjosephson@mybackwages.com
adunlap@mybackwages.com
rschreiber@mybackwages.com



By: */s/ Annette A. Idalski*
Annette A. Idalski

## **<u>CERTIFICATE OF CONFERENCE</u>**

This is to certify that counsel for Defendants Crescent Drilling and Production, Inc. and Crescent Drilling Foreman, Inc. conferred with counsel for Plaintiffs on February 25 and 28, 2022 regarding the substance of this Motion.  Counsel for Plaintiffs stated he is **<u>opposed</u>** to the relief sought herein.


*/s/ Brian A. Smith*
Brian A. Smith